2006 VT 115

# Rebecca Alger, et al. v. Department of Labor and Industry, et al.

[917 A.2d 508]

No. 05-001

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 9, 2006
Motion for Reargument Denied February 15, 2007

*Maryellen Griffin,* and *Karen Richards, Katherine Berkman, Stephen Norman* and *John J. McCullough* (On the Brief), Vermont Legal Aid, St. Johnsbury, for Plaintiffs-Appellants.

*William H. Sorrell,* Attorney General, and *Clifford Peterson,* Assistant Attorney General, Montpelier, for Defendants-Appellants.

¶ 1. **Johnson, J.** Plaintiffs Rebecca Alger, et al., appeal from the superior court's dismissal of their action against defendant Vermont Department of Labor and Industry, as well as from the court's denial of their application for class certification. Plaintiffs' claims arise primarily from the Department's attempted closure of an apartment building at 13 High Street in St. Albans for longstanding housing code violations. Plaintiffs allege that the conditions at 13 High Street are symptomatic of the Department's general failure to take action against the owners of rental housing who have violated the housing code.[1] Plaintiffs claim that the closure was an unconstitutional taking of property without due process or just compensation. They argue that the court's dismissal was premature because their allegations were sufficient to state due process and takings claims, as well as a claim in the nature of mandamus. Plaintiffs also contend that the

---

[1] Plaintiffs and the Department refer to the housing statutes and regulations that the Department administers collectively as the "housing code," "habitability statutes and rules," or "building safety regulations." For the sake of simplicity, we will use the term "housing code" to describe these statutes and regulations.

court improperly considered the merits of the case in denying class certification. We affirm in part, reverse in part, and remand.

¶ 2. Plaintiffs brought this action in November 2002, following the Department's order that the apartment building at 13 High Street be vacated by November 15, 2002, due to fire and electrical code violations. Plaintiffs' first complaint sought declaratory and injunctive relief pursuant to 21 V.S.A. § 209, which allows any person aggrieved by an action taken by the Commissioner of Labor and Industry to appeal the action to the superior court within twenty days of the action. The complaint alleged that the Department's order failed to comply with the due process requirements of notice and a preclosure hearing, that it was served improperly, and that the Department had failed to demonstrate that the building was imminently hazardous before ordering that it be vacated. In connection with their complaint, plaintiffs sought, and received, a preliminary injunction preventing the Department from closing the building. The Department then agreed to allow the building to remain open until further order of the superior court. Plaintiffs filed a second amended complaint adding claims against Thomas Komasa, the owner of 13 High Street, after he was brought in as a third-party defendant at the Department's request. Plaintiffs' claims against Mr. Komasa, some of which have been settled, are not at issue here.

¶ 3. In June 2003, following discovery, plaintiffs filed a third amended complaint containing revised claims and additional allegations against the Department. This complaint also added the claims of two plaintiffs, Tina Neville and Linda Limoge, who did not reside at 13 High Street. We treat the following allegations as true for the purposes of reviewing the superior court's dismissal. *Gilman v. Maine Mut. Fire Ins. Co.*, 2003 VT 55, ¶ 14, 175 Vt. 554, 830 A.2d 71 (mem.).

¶ 4. On October 14, 2002, the Department issued an order regarding numerous fire and electric code violations at 13 High Street. The order cited "a long history of violations" at that building that had been identified no later than 2000, although it did not include previous inspections from as far back as 1994 that had identified similar violations. According to the October 14, 2002 order, the Department had instructed the building's previous owner, Brian Simpson, to correct similar violations in May 2000, notified him of continuing violations in July 2000, and ordered him to correct the violations within thirty days in November 2000. When Mr. Simpson failed to correct the violations, the Department asked, in April 2001, that he submit a plan of corrective action within thirty days, and noted in a report that the violations

continued to exist as of August 2001. Chittenden Bank acquired the building from Mr. Simpson in 2002 by foreclosure, and sold it to Mr. Komasa in May 2002. In June 2002, Department personnel met with Mr. Komasa and informed him of the continuing code violations. Mr. Komasa told them that he would correct the violations, but on September 11, 2002, a Department inspection found "no evidence that any work had been done toward improving the condition of the building."

¶ 5. The October 14, 2002 order directed Mr. Komasa to: (1) immediately vacate apartment 5, the residence of plaintiff Laura Bean, because it no longer had electrical service and plaintiff Bean was using candles to light the apartment; (2) submit a plan of corrective action by October 21, 2002; and (3) begin repairs to correct the violations no later than November 1, 2002. The order stated that noncompliance would result in the closure of the building "until such time as all outstanding violations are corrected." The order was handed to plaintiff Corinne Bluto, who lived on the third floor, and wedged into the doorway of plaintiffs Alger and Todd Massey.

¶ 6. Plaintiff Bean vacated her apartment in October 2002. Plaintiffs Bluto, Alger, and Massey remained in their apartments. Although Mr. Komasa received an informal extension of the deadline for submitting a plan of corrective action until November 1, 2002, he did not submit such a plan by that date, and he took no action to begin correcting the violations. On November 5, 2002, the Department issued an order that the building be closed and its electrical service disconnected as of November 15, 2002. The order did not contain a statement that there was an imminent hazard. The Department did not provide plaintiffs an opportunity for a hearing prior to the closure date, and did not offer plaintiffs assistance in relocating or other compensation for the loss of their apartments. The Department took no additional action against Mr. Komasa, such as the imposition of administrative fines, and did not refer the case to the Franklin County state's attorney for civil or criminal prosecution.

¶ 7. Plaintiffs' complaint also contained allegations on behalf of plaintiffs Neville and Limoge, neither of whom shared plaintiffs' claims with respect to 13 High Street. Plaintiff Neville alleged that she had vacated her rental home because of numerous uncorrected code violations, all of which the Department had identified through inspections, but none of which the Department had ordered her landlord to correct. Plaintiff Limoge alleged that she was forced to vacate her rented mobile home when the Department disconnected her electrical service due to her landlord's failure to correct electrical code violations. The Department

took no action against either landlord before or after plaintiffs Neville and Limoge left their homes.

¶ 8. Plaintiffs' third amended complaint no longer relied on 21 V.S.A. § 209. Instead, the complaint phrased plaintiffs' legal claims in terms of the Department's failure to perform its mandatory statutory duties, and its failure to exercise discretion in performing its discretionary duties. The complaint alleged that the Department "arbitrarily abused [its] authority to enforce the habitability statutes and rules by failing and neglecting to take action to cause violations to be eliminated or removed in accordance with the statutes and rules," failed to establish or follow a procedure for penalizing landlords who fail to correct code violations, and failed to establish or follow a procedure for legal action against such landlords. Plaintiffs alleged that the Department's actions were consistent with its general failure to enforce the housing code except by evicting tenants in rental housing. That is, the Department rarely, if ever, issued fines or referred a landlord for prosecution, despite its statutory authority to do so, even after closing a rental property. The amended complaint also contained the previous complaints' claims that the Department took plaintiffs' property without due process or just compensation by terminating plaintiffs' residential tenancies without providing a preclosure hearing or taking effective action to force landlords to correct the violations that resulted in the closures.[2]

¶ 9. Plaintiffs also moved to certify a class of similarly situated tenants and a subclass of tenants who had suffered the loss of their rental housing. Plaintiffs' motion for class certification defined the class as "all residents of rental housing in Vermont where there are one or more violations of the statutes and rules pertaining to habitability and enforced by [the Department]," including "all people who now reside in such housing, all people who have resided in such housing since November 13, 1999, and all people who will reside in such housing in the future." The subclass was composed of "all Vermont residential tenants who have in the past three years, or will in the future, be forced to move out of their homes as a result of [the Department's] actions and

---

[2] Of the named plaintiffs listed in the third amended complaint, we note that only plaintiffs Bean, Neville, and Limoge raise individual claims of takings without just compensation. We continue to refer to these plaintiffs as "plaintiffs" to avoid confusion.

omissions regarding code enforcement in rental housing." The Department opposed class certification, and the superior court denied plaintiffs' motion, finding that plaintiffs' proposed class failed to meet the requirements of Vermont Rule of Civil Procedure 23.

¶ 10. The Department also filed a motion to dismiss under Rule 12(b)(6), arguing that the allegations in plaintiffs' complaint were insufficient to state a claim for which relief could be granted. The superior court granted the Department's motion and dismissed plaintiffs' claims, ruling that the Department's action in forcing plaintiffs to vacate their rental housing was an exercise of the police power, not subject to due process or takings analysis, and that plaintiffs' claims that the Department had abused its authority, which were in the nature of the writ of mandamus, were not properly brought under Rule 75. Even had plaintiffs followed the procedures of Rule 75, the court stated that their allegations were legally insufficient because the Department's duty to act was discretionary, and any failure to act was not "an arbitrary abuse of power." See *Sagar v. Warren Selectboard*, 170 Vt. 167, 171, 744 A.2d 422, 426 (1999) (stating that mandamus is not generally available for discretionary decisions absent an arbitrary abuse of power).

¶ 11. Plaintiffs now appeal the court's dismissal of their complaint and its denial of their motion for class certification. They argue that the court erred by: (1) dismissing their complaint despite allegations that were sufficient to state mandamus, takings, and due process claims against the Department; and (2) improperly considering the merits of their complaint in denying their motion for class certification. We agree that the court's dismissal of plaintiffs' claims was premature, but find that denial of class certification was appropriate here, and therefore, we affirm in part, reverse in part, and remand for further proceedings.

I.

¶ 12. Plaintiffs first contend their complaint should have survived a motion to dismiss because it stated claims upon which relief could be granted. "A motion to dismiss . . . is not favored and rarely granted." *Gilman*, 2003 VT 55, ¶ 14. This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." *Ass'n of Haystack Prop. Owners, Inc. v. Sprague*, 145 Vt. 443, 447, 494 A.2d 122, 125 (1985). In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allega-

tions as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." *Amiot v. Ames*, 166 Vt. 288, 291, 693 A.2d 675, 677 (1997) (quoting *Levinsky v. Diamond*, 140 Vt. 595, 600-01, 442 A.2d 1277, 1280-81 (1982)). We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.[3] *Id.*

## A.

¶ 13. We first address plaintiffs' claim that the Department failed to enforce the housing code, which plaintiffs characterize as a claim in the nature of mandamus. Although Rule 81(b) abolished the writ of mandamus, relief in the nature of mandamus remains available under Rule 75. *Garzo v. Stowe Bd. of Adjustment*, 144 Vt. 298, 299-300, 476 A.2d 125, 126 (1984). The superior court faulted plaintiffs for failing to proceed under Rule 75, but plaintiffs did not fail to satisfy any requirement of Rule 75 by simply filing a complaint demanding a mandatory injunction. To the extent Rule 75 alters the requirements of mandamus, it relaxes its formal requirements — for instance, by eliminating responsive pleading requirements at the discretion of the court, and by allowing amendment to permit a defective Rule 75 claim to be brought as an ordinary civil action. V.R.C.P. 75(b).

¶ 14. The Department interprets the court's statement as a ruling that plaintiffs' claims were brought outside the statute of limitations. We see no indication of such reasoning in the court's ruling. The limitations period set by Rule 75 with respect to failures to act is "six months after expiration of the time in which action should reasonably have occurred." V.R.C.P. 75(c). This time limit, however, is not jurisdictional, *Fyles v. Schmidt*, 141 Vt. 419, 422, 449 A.2d 962, 964 (1982), and the Department raises it for the first time on appeal. The only time bar raised below was with respect to plaintiffs' challenge under 21 V.S.A. § 209; the Department failed to address any applicable

---

[3] Our disagreement with the dissent appears to be over the breadth of the standard of review in this case. Our standard of review of 12(b)(6) motions is long-standing and generous to the nonmovant, and thus, we read plaintiffs' complaint broadly — recognizing that their allegations are novel. The dissent, on the other hand, appears to read the complaint narrowly and, as such, forecloses the possibility of further evidentiary development at the trial court level in contravention of the standard, which disfavors dismissal by 12(b)(6) motion.

bar to plaintiffs' mandamus claims, and responded to these claims only in terms of its lack of a mandatory duty. We thus decline to address this issue on appeal. See *Rennie v. State*, 171 Vt. 584, 587, 762 A.2d 1272, 1277 (2000) (mem.) (refusing to consider a statute of limitations argument that was not specifically raised below, even though the same issue had been raised with respect to related claims).

¶ 15. Perceiving no procedural default, we turn to the substance of plaintiffs' complaint. Mandamus will ordinarily lie only "to compel a public officer to perform an official act which is merely ministerial," and only where "the right sought to be enforced is certain and clear." *Roy v. Farr*, 128 Vt. 30, 34, 258 A.2d 799, 801-02 (1969). This rule is subject to the exception, however, that where there is "an arbitrary abuse of the power vested by law in an administrative officer or board which amounts to a virtual refusal to act or to perform a duty imposed by law, *mandamus* may be resorted to in the absence of other adequate legal remedy." *Id.* at 34, 258 A.2d at 802.

¶ 16. Although the fire, electrical, and plumbing safety codes are each addressed by a separate statutory scheme, the enforcement provisions of each are similar. Each code explicitly commits enforcement to the discretion of the Department by allowing the Commissioner of Labor and Industry to set priorities for inspection and enforcement. See 21 V.S.A. § 252(b) (2003)[4] (allowing the commissioner to "establish priorities for enforcing these rules and standards based on the relative risks to persons and property from fire of particular types of premises"); 26 V.S.A. § 893 (allowing the commissioner to set electrical inspection priorities); *id.* § 2173(b) (allowing the commissioner to set priorities for plumbing inspection and enforcement).

¶ 17. Each code also empowers the Department to respond to violations in several ways. Each contains a provision authorizing an administrative fine of not more than $1,000 for each violation of a rule or order. 21 V.S.A. § 254(c) (2003) (fire); 26 V.S.A. § 897(a) (electrical); *id.* § 2175(d) (plumbing). In addition, each authorizes action in the superior court to enforce a regulation or order by injunctive relief and, in the case of fire code violations, fines of up to $20,000. 21 V.S.A. § 254(a)-(b) (allowing superior court prosecution for injunctive or other relief and

---

[4] Pursuant to 2003, No. 141 (Adj. Sess.), fire safety jurisdiction was transferred to the Department of Public Safety, and the relevant provisions in Title 21 were transferred to Title 20, §§ 2728-2739. For the purposes of this opinion, we refer to the provisions in place at the time of plaintiffs' original complaint.

fines of up to $10,000 for a violation of any provision and $20,000 for a violation of an emergency order); 26 V.S.A. § 897(b) (authorizing the superior court, "on application by the commissioner," to grant injunctive relief for electrical code violations); *id.* § 2175(e) (authorizing the superior court, "[o]n application by the commissioner," to enjoin plumbing code violations.[5] Each scheme also authorizes the Department to issue an order to the owner of the premises to correct a violation. 21 V.S.A. § 253(a) (fire); 26 V.S.A. § 895 (electrical); *id.* § 2175(b)(1) (plumbing). If a fire code violation is not corrected following an order, the building may be closed. 21 V.S.A. § 253(a). An uncorrected plumbing or electrical violation may result in the disconnection of service. 26 V.S.A. § 895 (electrical); 26 V.S.A. § 2175(b)(3) (plumbing).

¶ 18. By authorizing the Commissioner of Labor and Industry to set inspection and enforcement priorities and enabling the Department to exercise one or more of several enforcement options, the Legislature has vested a great deal of discretion in the Department in performing the duties addressed in plaintiffs' complaint. Thus, the duties plaintiffs seek to enforce are not ministerial, and mandamus can lie against the Department only under the "arbitrary abuse of power" exception. See *Roy*, 128 Vt. at 34, 258 A.2d at 801-02 (distinguishing discretionary duties from ministerial acts). To determine whether plaintiffs' claim fits within this exception, we must determine whether the facts they allege and the reasonable inferences from those facts establish that the Department's conduct was so arbitrary that it amounted to a refusal to

---

[5] We reject the Department's argument that the statute vests civil prosecutorial discretion solely in the state's attorney. The housing code contemplates that the Commissioner of Labor and Industry will refer some set of violations to the state's attorney for prosecution. For instance, the fire code provides that "[t]he state's attorney of the county in which [a] violation occurs shall prosecute such violation and may commence a proceeding in the superior court." 21 V.S.A. § 254(a). While this language, in isolation, might seem to vest discretion solely in the state's attorney, § 254(c) provides, after authorizing the commissioner to assess administrative penalties, that "[a]n election by the commissioner to proceed under this subsection shall not limit or restrict *the commissioner's authority* under subsection (a) of this section," indicating that the commissioner is primarily responsible for initiating civil prosecution, presumably by referring violations to the appropriate state's attorney. (Emphasis added.)

act or a failure to perform a legal duty, and that plaintiffs have no other adequate remedy. *Id.* at 34, 258 A.2d at 802.

¶ 19. We agree with plaintiffs that they have no alternative remedy. "In order to supersede *mandamus*, the other remedy must be competent to afford relief on the very subject matter in question, and be equally convenient, beneficial and effective." *Id.* at 37, 258 A.2d at 803. The Department argues that plaintiffs have a remedy under 21 V.S.A. § 209, which allows for appeals to the superior court from actions or orders of the Commissioner of Labor and Industry, but this statute, by its plain language, applies only to actions and orders, not to failures to act. 21 V.S.A. § 209 ("[A] person aggrieved by *an order or action* of the commissioner ... may appeal to the superior court for the order or action within 20 days after the order is issued or the action is taken.") (emphasis added). Rule 75 is a better avenue for challenging a failure to act, and the Department has identified no alternative remedy. See V.R.C.P. 75(a) (allowing review of "[a]ny action *or failure or refusal to act* by an agency of the state or a political subdivision thereof") (emphasis added).

¶ 20. The key question is thus whether the Department's alleged failures to act were sufficiently arbitrary that they can be characterized as nonperformance of a legal duty. We acknowledge that it is difficult to articulate a clear answer to this question. In the context of a motion to dismiss, though, we need to consider only two broad preliminary questions to determine whether plaintiffs' complaint is sufficient to survive dismissal and allow further factual development: (1) whether there is some minimum standard of conduct with which the Department must comply; and (2) whether plaintiffs' complaint alleges that the Department has failed to comply with that standard.

¶ 21. Plaintiffs contend that, while the Department has discretion in how it enforces the housing code, the Department's actions represent a wholesale failure to enforce the code. The Department responds by arguing that it does not owe plaintiffs a legal duty of any kind, including a duty to enforce the housing code. The Department appears to base this argument on the fact that it does not owe plaintiffs a duty of care in tort. See, e.g., *Corbin v. Buchanan*, 163 Vt. 141, 144, 657 A.2d 170, 172 (1994) (holding that agency could not be held liable for damages resulting from allegedly negligent fire safety inspections). The type of duty plaintiffs must assert to fit within the exception to the requirements of mandamus is distinct from a duty of care. The proposition that the law imposes duties on an administrative agency is not related to the proposition that the agency must take care to prevent

harm to the public or risk liability for negligence. In *Roy*, for instance, we held mandamus to lie against a local board for its failure to correct a previously identified violation of the health code. 128 Vt. at 36, 258 A.2d at 803. There, the duty imposed by law on the board was not a duty that the plaintiff could enforce in tort if he fell ill as a result of the violation. Instead, it was a more general duty to obey and enforce a mandatory statutory provision. *Id.* Thus, the fact that the Department does not owe plaintiffs a duty of care does not resolve the question of whether the Department may have other affirmative legal duties.

¶ 22. We agree with plaintiffs that the Department has, at minimum, a legal duty to enforce the housing code, and that a wholesale failure to enforce the code would violate that duty. This is a somewhat simplistic and misleading description of the Department's alleged conduct, however. Such a description cannot be reconciled with the fact that, for instance, the Department inspected the building at 13 High Street several times and identified multiple violations of the code, nor with the fact that the Department ultimately ordered the building closed and its utility service terminated. A more accurate description of the alleged conduct is that the Department enforced the housing code as a regime of voluntary compliance. The specific omissions identified by plaintiffs are the Department's repeated failures to issue administrative fines or refer violations of the housing code and specific Department orders to the state's attorney for civil prosecution. In other words, the Department failed to take any action to ensure compliance with the provisions of the housing code or its own specific orders.

¶ 23. We conclude that the Department's use of a voluntary enforcement scheme can be characterized as a failure to perform a legal duty. Although there can be no expectation that the Department's limited resources will allow it to correct every code violation, a voluntary compliance regime is entirely inconsistent with the statutory framework of the housing code. The fire code phrases the duties of landlords in mandatory terms, explicitly requiring compliance with the Department's fire safety rules. See 21 V.S.A. § 251(b)-(c) (stating that "[a] person shall not maintain, keep or operate any premises or any part thereof . . . in a manner which causes or is likely to cause harm to other persons or property in case of fire" and that "[o]n premises under his control, a person shall observe rules promulgated under this subchapter for the prevention of fires which may cause harm to other persons or property"). While the electrical and plumbing codes lack similarly explicit language, they imply much the same thing by authorizing

penalties for violations of the Department's rules and orders. *Supra,* ¶ 16. The Legislature could have enacted the housing code as a system of voluntary compliance, where the Department's only duties would have been to inform landlords of their deviations from sound safety practices, and to step in as a last resort to prevent imminent threats to the community. Instead, it created a system composed of mandatory provisions, and it assigned responsibility for enforcing those provisions to the Department.

¶ 24. Plaintiffs contend that the Department has subverted this mandatory statutory scheme by following a general policy that violations of the housing code will not result in sanctions against landlords. According to the complaint, the long history of violations at 13 High Street resulted in only the following pattern of action and inaction by the Department: (1) the Department inspected the building and identified serious violations; (2) the Department informed the landlord of the results of the inspection; (3) the Department issued a specific deadline for correction of the violations identified by the inspection report; (4) the landlord failed to take any corrective action; and (5) the Department took no further action until the next time it inspected and identified the same or similar violations. After several years of repeating this cycle, the violations became severe enough that the Department threatened to close the building if Mr. Komasa failed to complete the ordered repairs. When Mr. Komasa did not respond, the Department ordered the building closed, but took no additional enforcement action against Mr. Komasa.

¶ 25. While the Department correctly points out that the housing code did not require the Department to take a specific enforcement action, such as issuing an administrative fine or referring the matter to the state's attorney for civil prosecution, the pattern of violations plaintiffs have identified required some response beyond issuing yet another order requesting compliance. Instead, obeying the housing code, and even obeying direct orders of the Department, became an entirely voluntary obligation on the part of Mr. Komasa and his predecessors. The incentives created by the Department's alleged enforcement scheme were for the building's landlords to ignore the housing code and the Department's occasional inspections and orders, to avoid spending any additional money on a deteriorating building, and to allow the building to grow progressively less safe, until it finally became uninhabitable. The housing code became a mandatory obligation only when the building was deemed imminently hazardous. At that point, it may well have been in Mr. Komasa's best interest to have the

tenants of 13 High Street removed, allowing him to renovate and find new tenants, presumably at a higher rent.

¶ 26. The Department's alleged enforcement regime appears inherently ineffective with respect to ensuring anything but the minimum level of housing code compliance necessary to avoid imminent hazards; everything else is left to the discretion of the landlord. The only meaningful role the Department plays in protection against run-of-the-mill violations is to inform the landlord of their existence. A landlord who is confident that a building can be maintained at a minimally habitable level, or who is indifferent to the loss of already-diminishing rental income from a deteriorating building, may ignore the housing code with impunity. Rental housing under such an enforcement regime cannot be expected to be any safer or healthier than it would be without any housing code at all. If that is the system the Department has implemented, it represents an arbitrary abuse of power that amounts to a failure to comply with its legal duties. As plaintiffs' complaint is sufficient to allege that such a system is in place, it states a claim in the nature of mandamus under Rule 75. We reverse and remand so that plaintiffs may attempt to prove their allegations.

## B.

¶ 27. We next address plaintiffs' claim that the Department's actions resulted in the loss of their leaseholds without due process or just compensation. We agree with the Department that the isolated act of ordering a building vacated cannot be characterized as an unconstitutional taking without just compensation, or as a taking without due process, when the order to vacate is necessary to eliminate an imminent threat of harm. We nevertheless hold that dismissal on these grounds was premature with respect to plaintiffs' takings claims. While plaintiffs' complaint does not state a due process claim, the facts alleged were sufficient to raise the question of whether the Department's alleged failures to act led to the destruction of plaintiffs' leaseholds without compensation.

¶ 28. We first address plaintiffs' claim that the Department failed to provide them with due process, in the form of notice and a hearing, prior to ordering that they vacate their homes. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The United States Supreme

Court has interpreted this Due Process Clause to require notice and a predeprivation hearing before a person's property is taken. *Fuentes v. Shevin*, 407 U.S. 67 (1972). This requirement does not apply, however, in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after [deprivation]." *Id.* at 82 (quotations omitted). "Protecting citizens from an immediate risk of serious bodily harm falls squarely within those 'extraordinary situations' contemplated in *Fuentes*." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994).

■ ¶ 29. We agree with the Department that the closure of the building at 13 High Street and the termination of utility service at the other buildings were justified by an immediate risk of serious bodily harm. "[W]here the need to protect lives is the basis for [the challenged deprivation], government officials should not be made to hesitate in performing their duties, particularly where postdeprivation remedies can immediately correct any errors in judgment." *Id.* at 168. While there might be circumstances under which the Department's findings of code violations would be insufficient to establish the exigency necessary for action without a prior hearing, plaintiffs' allegations do not establish such circumstances. Each of the Department's orders to vacate or cut off utility service was supported by findings of dangerous code violations, and plaintiffs' complaint concedes the existence, and in most cases, the seriousness, of these violations. Indeed, much of the complaint is devoted to establishing that the longstanding violations were serious enough to merit Department action prior to the orders to vacate. No further factual development is necessary to determine that the violations at issue posed enough of a threat to merit ordering plaintiffs to vacate their homes, and it was, therefore, appropriate for the court to dismiss plaintiffs' due process claims.

■ ¶ 30. It was not appropriate, however, for the court to dismiss plaintiffs' takings claims. Both the Vermont and federal constitutions prohibit takings of private property for public purposes without compensation. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); Vt. Const. ch. I, art. 2 ("That private property ought to be subservient to public uses when necessity requires it, nevertheless, whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."). This prohibition applies not only when the government takes property for its own use through the formal procedures of eminent domain, but also when government regulation results in the

loss of a property interest. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). The property interest lost need not be an ownership interest; a leasehold is an interest in property subject to analysis under the takings clause. *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976); see also *Devines v. Maier*, 728 F.2d 876, 880 (7th Cir. 1984) (holding that a residential leasehold is a property interest compensable under the takings clause). Moreover, the loss need not be permanent; a temporary taking of property can be compensable. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318 (1987).

 ¶ 31. The prohibition on takings without compensation is not absolute. We have previously held that an exercise of the police power to abate a public nuisance, and specifically, to abate a fire hazard, is not a compensable taking. *Eno v. City of Burlington*, 125 Vt. 8, 13, 209 A.2d 499, 504 (1965) ("A fire hazard is a nuisance and the abatement of such a nuisance is not the taking of property without due process or a taking for which compensation must be made."). While takings jurisprudence, especially at the federal level, has undergone significant development since our holding in *Eno*, there remains no question that the abatement of a nuisance is not a taking. "'[T]akings' jurisprudence . . . has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property." *Lucas*, 505 U.S. at 1027. Thus, where, as here, "the State seeks to sustain regulation that deprives land of all economically beneficial use," it may refuse to compensate a property owner only if the regulation prohibits a use of the land that was "not part of his title to begin with." *Id.* When the challenged state action is consistent with "background principles of the State's law of property and nuisance," no property interest has been taken, and no just compensation is due. *Id.* at 1029.

 ¶ 32. Although plaintiffs bear no responsibility for creating the nuisance the Department attempted to abate through its orders, remaining in a building that posed a threat to public safety was not among the "bundle of rights" reserved to them as tenants. Vermont law allows a tenant to remain in a dwelling after a landlord's violation of the warranty of habitability. See 9 V.S.A. § 4458(a) (providing that a tenant "may . . . terminate the rental agreement on reasonable notice" if the landlord fails to comply with habitability requirements, as one of several alternatives under such circumstances). This does not mean,

however, that tenants are entitled to remain in a building when doing so threatens the surrounding community, as in cases where occupancy of the building poses a fire hazard. Accordingly, to the extent plaintiffs' claims challenge the Department's ultimate decision to order that their homes be vacated or their utility service be terminated, their allegations do not state valid takings claims.

¶ 33. It would be unfair, however, to construe plaintiffs' claims so narrowly. Instead, we understand plaintiffs to challenge the Department's entire course of action with respect to the dwellings at issue. Like plaintiffs' claims under Rule 75, their takings claims rest on their allegations that the Department failed to carry out its enforcement duties. In this sense, the government action that resulted in the destruction of plaintiffs' property interests was the Department's alleged policy of enforcing the housing code only as a last resort in cases of imminent harm. This approach to takings analysis is entirely consistent with *Eno*, as plaintiffs do not seek compensation for the Department's abatement of a nuisance. Instead, they seek compensation for the Department's role in allowing the nuisance to continue unabated for so long. At the time plaintiffs were forced to vacate their homes, each plaintiff possessed only the illusory right to remain in an imminently hazardous dwelling. At the time plaintiffs allege the Department *should have acted*, though, each had a valid property right to occupy her home.

¶ 34. We recognize that plaintiffs' takings claims are unusual, but that is not a sufficient reason to allow their dismissal without full factual development. See *Sprague*, 145 Vt. at 447, 494 A.2d at 125 (stating that claims should not be dismissed simply because they are novel or extreme). We need only ascertain that plaintiffs' complaint corresponds to general takings principles, and we conclude that it does. The complaint alleges that the Department's choice to enforce the housing code only as a last resort deprived them of all beneficial use of their homes. See *Lucas*, 505 U.S. at 1015 (stating that just compensation is categorically appropriate "where regulation denies all economically beneficial or productive use of land"). The complaint also contains sufficient allegations to remove plaintiffs' claims from the exception that the government need not compensate for enforcing pre-existing background principles of nuisance. *Id.* at 1029. The government's ability to avoid paying compensation when it abates a nuisance, such as an imminent fire hazard, is conditioned on its lack of responsibility for the exigency. See *Devines*, 728 F.2d at 884 (allowing the state to condemn uninhabitable residential apartments without compensating

the tenants when "the uninhabitability of the leasehold interest . . . occurs through no fault of the State").

¶ 35. Plaintiffs and the Department agree that the landlords of the buildings at issue were primarily responsible for the buildings' condition, but plaintiffs contend that the Department shares that responsibility. They allege that the Department knew of the relevant code violations, and that in the face of the landlords' refusal to take corrective action, it chose to allow the violations to continue until they became serious enough to require removal of the tenants or termination of utility service. But for the Department's failure to act, there would have been no nuisance to abate, and plaintiffs' property would not have been taken.[6] If plaintiffs can prove these allegations, they will be entitled to just compensation. Their complaint thus states valid takings claims, and the superior court's dismissal of these claims was premature.

## II.

¶ 36. As a final matter, we affirm the superior court's denial of class certification. Provided that the superior court has applied the correct legal standards, we review the court's decision on a motion for class certification for abuse of discretion. *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999). Here, plaintiffs contend that the court erred in applying the law, so our review is de novo. *Miller v. Miller*, 2005 VT 89, ¶ 10, 178 Vt. 273, 882 A.2d 1196. Motions for class certification are controlled by Rule 23, which is substantively identical to Federal Rule 23. Reporter's Notes, V.R.C.P. 23. To be certified, a class must satisfy the four requirements of Rule 23(a), which are commonly referred to as numerosity, commonality,

---

[6] The dissent mischaracterizes plaintiffs' takings claim when it posits that our decision would allow "[a]ll victims of loss arising from regulatory or criminal violations by third parties [to] claim compensation upon a mere allegation [of] . . . a lack of action by the enforcement authority." *Post,* ¶ 58. Plaintiffs allege a complete failure of the Department to act as statutorily prescribed — affecting an entire class of persons — rather than a discretionary decision resulting in dissatisfaction or loss to one renter. At this point in the proceedings plaintiffs have merely made allegations (presenting novel mandamus and takings claims) that we are allowing to go forward; whether plaintiffs will ultimately be successful on the merits of their claims, we leave to the trial court upon full development of the facts.

typicality, and adequacy of representation.[7] E.g., *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Rule 23(b) contains additional prerequisites, but the superior court did not consider whether a class action would be appropriate under Rule 23(b), as it determined that the class failed to satisfy the requirements of Rule 23(a).

¶ 37. Plaintiffs moved for certification of a class containing "all residents of rental housing in Vermont where there are one or more violations of the statutes and rules pertaining to habitability and enforced by [the Department]," including "all people who now reside in such housing, all people who have resided in such housing since November 13, 1999, and all people who will reside in such housing in the future." In addition, plaintiffs sought to certify a subclass "of all Vermont residential tenants who have in the past three years, or will in the future, be forced to move out of their homes as a result of [the Department's] actions and omissions regarding code enforcement in rental housing."

¶ 38. The superior court determined that the proposed class was overbroad, and thus, that "it would not be administratively feasible for the Court to determine if a particular individual is a member of the proposed class." See 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1760, at 136, 140 (3d ed. 2005) (stating that although a class need not be "so ascertainable that every potential member can be identified at the commencement of the action," it must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member"). Furthermore, the court decided against plaintiffs on class certification because a class cannot "be defined so broadly that it encompasses individuals who have little connection with the claim being litigated," nor can the class definition be too "amorphous." *Id.* at 142-47.

¶ 39. Our analysis of the proposed class definition leads us to the same conclusion as the superior court. The class included virtually every renter and leasehold in the state of Vermont over which the Department has jurisdiction and where there may have been a code violation. It was entirely fair for the superior court to hold that the

---

[7] The precise terms of Rule 23(a) require, in relevant part, that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defense of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

class was too amorphous as so defined. We acknowledge that the trial court could have required a narrower definition of the class that was more in line with the allegations in the complaint, and that it did not do so. *In re New York City Mun. Sec. Litig.*, 87 F.R.D. 572, 580 (S.D.N.Y. 1980). ("Prior to decision on the merits, leave to amend the complaint to redefine the class should be freely given [by the trial court]."). There was no real effort to force redefinition because the trial court dismissed the action for failure to state a claim.

¶ 40. On remand, however, a trial court has discretion to change a decision not to certify a class, even where an appellate court has affirmed the trial court's earlier denial of class certification. *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1350 (5th Cir. 1985). Under Rule 23(c)(1), the superior court has continuing power to adjust its class decisions in light of evidentiary developments and the general progression of the case from assertion to facts. *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983). In view of the early stage of this litigation, and our reversal of the trial court on the motion to dismiss, plaintiffs are not barred from seeking certification of a more precisely defined class that meets the standards of Rule 23.

¶ 41. We add, as guidance on remand, that plaintiffs must establish a sufficient connection between any proposed class of renters and the Department for a class action to stand. At the same time, we caution the trial court that in the event that plaintiffs move to certify a new class on remand, the certification decision must be made wholly apart from a consideration of the merits of the case using the standards set out under Rule 23(a) & (b).

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with the views expressed herein.*

¶ 42. **Burgess, J.**, concurring in part and dissenting in part. Rather than call on the courts to run the Department of Labor and Industry, a task we are neither qualified nor authorized to do, plaintiffs should address their complaint to the executive branch responsible for setting code enforcement priorities, and to the legislative branch that granted the Department its broad discretionary authority over the priority and method of housing code enforcement. Contrary to the tenor of the complaint and the majority opinion, the applicable statutes impose no requirement on the Department to use its

enforcement tools in any particular sequence, to any prescribed degree, or in any manner more satisfactory to plaintiffs. Therefore, I would affirm the trial court's dismissal of plaintiffs' complaint for failing to state a viable cause of action.

¶ 43. Regarding plaintiffs' due process claim, the legislation cited in the complaint imposes neither an actionable duty issuing from the Department to these plaintiffs in particular, nor any procedural conditions on the Department before it responds to imminent hazards. As acknowledged by the majority, the Department may respond to emergencies with emergency measures, without a prior hearing, and properly did so in the case of the plaintiffs living at 13 High Street. Thus, I concur with the majority's decision to affirm dismissal of the plaintiffs' due process claims as unfounded.

¶ 44. As for plaintiffs' request for class certification, the named plaintiffs appear to have little in common with the amorphous and varied class that they purport to represent. The original plaintiffs at 13 High Street had to vacate after a long history of inspections reiterated code violations that ultimately threatened an immediate risk of bodily harm. Intervening plaintiff Neville alleges being misled by her landlady to move back into a residence previously condemned, and not approved for reoccupancy, by the Department. The code violations described by intervening plaintiff Limoge were imminently hazardous, but her inspection experience — three inspections in three days — was quite different from that of the other plaintiffs. Thus, on the pleadings, the situations of the named plaintiffs are dissimilar, and they have little resemblance to the broad class they claim to represent: "all ... tenants," three years past and in the future, who "live in housing where there exists one or more violations of the codes," regardless of the severity of the violation.

¶ 45. The class, as pleaded, fails to satisfy the "[p]rerequisites to a class action" set out under V.R.C.P. 23(a). Questions of law and fact must be common to the class, *id.* 23(a)(2), and claims of the named plaintiffs based on acts or omissions of the Department must be typical of the claims of the class. *Id.* 23(a)(3). The complaint fails to allege what law, facts and claims are common and typical between tenants forced out of their homes due to immediate danger of fire or electrocution, and plaintiffs' proposed class of tenants faced with single, or even multiple, minor code violations such as nonworking electrical outlets, absent bannisters or missing junction box covers. If the putative class alleged by plaintiffs "is so numerous that joinder of all members is impracticable," as required by V.R.C.P. 23(a)(1), it is only because the class is

overbroad as pleaded. Accordingly, I concur with the majority's decision to affirm the trial court's denial of class certification.

¶ 46. I would, however, also affirm the trial court's dismissal of plaintiffs' mandamus and takings claims. Plaintiffs seek to mandate the Department of Labor and Industry to enforce the housing codes against landlords in a manner satisfactory to the tenants, and, under a tortured theory of unconstitutional governmental taking, look to the Department to pay tenants for closing dangerous rental units. Plaintiffs' frustration is understandable in that they are relatively powerless and stuck between the Department's code enforcement and their landlords' recalcitrance. Nevertheless, their complaint alleges only that the Department is enforcing the housing code in a manner disagreeable to them, rather than contrary to statute. Notwithstanding the majority's inaccurate characterization of the Department's enforcement program as one of "voluntary compliance," the allegations in the complaint describe enforcement decisions and mechanisms falling well within the choices authorized by the Department's enabling legislation.

¶ 47. The enforcement program described by plaintiffs could just as easily be characterized as "comply or close," rather than "voluntary compliance," and the majority agrees that the orders to vacate in this case were justified by the emergency situations presented. *Ante*, ¶ 29. Because the complaint fails to set forth an "arbitrary abuse of power" by the Department sufficient to support the mandamus action, *Roy v. Farr*, 128 Vt. 30, 34, 258 A.2d 799, 802 (1969), and further fails to allege any unconstitutional taking recognized in law, both claims were properly dismissed. Accordingly, I respectfully dissent from the remand for further litigation.

¶ 48. Given the undisputed facts of the Department's enforcement efforts as pleaded by plaintiffs, even the majority is compelled to describe as "somewhat simplistic and misleading" plaintiffs' claim that the Department's actions amounted to a wholesale failure to enforce the code. *Ante*, ¶ 22. Plaintiffs' own allegations demonstrate that the Department made frequent inspections of the subject properties, found violations, issued orders compelling the landlords to rectify the violations, required the landlords to prepare a plan of corrective action, threatened various actions if the landlords did not comply, and eventually closed hazardous buildings or terminated dangerous utility services when the landlords failed to comply.

¶ 49. The majority moves to revive the complaint, however, by reconstructing what, in the majority's view, plaintiffs really meant to say —

that the Department's methods of enforcing the housing code amounted to "a regime of voluntary compliance" in which there was no effort to coerce correction of violations.[8] The reason that plaintiffs do not actually make such a claim might be because several of their own allegations are expressly contrary to the majority's characterization of their claim. Indeed, it is precisely the Department's enforcement of the fire and electrical safety statutes, rather than toleration of imminent hazards, that prompted plaintiffs' complaint. The complaint describes a system of inspections combined with closure orders that fall squarely within the Department's discretion as authorized by law. The alleged facts show that the Department inspected, found violations, ordered compliance, threatened consequences for noncompliance, and then followed through on the consequences. What plaintiffs seek is increased intermediate enforcement efforts emphasizing litigation to assess monetary and judicial sanctions against landlords, but the statutes impose no duty on the Department to enforce the code as preferred by plaintiffs. Nor do plaintiffs allege that their remedy of mandated fines, penalties, and injunctions would actually be more effective — and not result in earlier closures and more tenant dislocation — than the policy alleged to be in place.

¶ 50. In any event, the enforcement actions that plaintiffs complain about here are explicitly discretionary and not subject to mandamus. As the majority acknowledges, mandamus is ordinarily limited to compelling "merely ministerial" acts of public officials. *Roy*, 128 Vt. at 34, 258 A.2d at 801. Mandamus "does not issue to compel action that is discretionary," *Richardson v. City of Rutland*, 164 Vt. 422, 424, 671 A.2d 1245, 1247 (1995) (quoting Dobbs, Remedies § 2.10, at 112 (1973) (internal quotations omitted), except "'[w]here there appears, in some form, an arbitrary abuse of the power vested by law in an administrative officer . . . which amounts to a virtual refusal to act or to perform a duty imposed by law.'" *Id.* (quoting *Couture v. Selectmen of Berkshire*,

---

[8] The majority asserts that its reading of the complaint as such is simply a matter of broad reading encouraged by the standard of review under V.R.C.P. 12(b)(6). *Ante*, ¶ 12 n.3. But even the broadest reading must still consider all of the nonmoving party's factual allegations as true. See *Richards v. Town of Norwich*, 169 Vt. 44, 48-49, 726 A.2d 81, 85 (1999). Here, plaintiffs' *factual* allegations were that the Department routinely exercises some statutorily authorized enforcement actions, although not others. My view that plaintiffs' dissatisfaction with the enforcement options actually pursued by the Department fails to support a claim of utter failure in enforcement is not a result of narrow reading, as the majority suggests, but rather is the product of treating plaintiffs' factual allegations as true.

121 Vt. 359, 361, 159 A.2d 78, 80 (1960)); see *Vt. State Employees' Ass'n v. Vt. Criminal Justice Training Council*, 167 Vt. 191, 195, 704 A.2d 769, 771 (1997) (explaining that writ of mandamus may be extended, in the absence of any other adequate legal remedy, only "to reach extreme abuses of discretion involving refusals to act or perform duties imposed by law").

¶ 51. In this case, as the majority acknowledges, the fire, electrical, and plumbing safety statutes all commit inspection and enforcement priorities to the discretion of the Commissioner of Labor and Industry. *Ante*, ¶ 16. Each safety scheme authorizes, but does not require, the Department to respond to violations in various ways, including issuing orders to building owners to correct violations, 21 V.S.A. § 253(a) (fire); 26 V.S.A. § 895 (electrical); 26 V.S.A. § 2175(b)(1) (plumbing), and to impose a variety of sanctions if the violations are not corrected. See 21 V.S.A. § 253(a) (Commissioner *"may"* close building if fire code violation is not corrected); 26 V.S.A. § 895 (Commissioner *"may"* disconnect electrical service if code violation is not corrected); 26 V.S.A. § 2175(b)(3) (Commissioner *"may"* disconnect water or sewer service if plumbing code violation is not corrected) (emphases added). The statutes also authorize, but do not require, the Department to seek civil and administrative fines and injunctions for violations. *Ante*, ¶ 17. Further, as in the instant case, if the Commissioner deems a fire code violation to be imminently hazardous, the Commissioner "shall" order the violation corrected immediately and, if it is not corrected, *"may"* order the premises immediately closed until the violation is corrected. 21 V.S.A. § 253(a) (emphasis added).

¶ 52. The majority's recognition of a mandamus action based on the allegations in plaintiffs' complaint is wholly unsupported and, in fact, contradicted by the pleadings. The majority acknowledges that the statutes vest within the Department "a great deal" of enforcement discretion, *ante*, ¶ 18, and then recites the plaintiffs' allegations that the Department inspected buildings, ordered correction of violations, and later ordered the closing of imminently hazardous premises for noncompliance. Yet, notwithstanding its acknowledgment of the Department's enforcement actions, the majority stretches to allow the mandamus claim by declaring that the Department's inspections and orders to close and vacate dangerous premises in the face of uncorrected violations could "be characterized as a failure to perform a legal duty," because the Department did not exercise the other enforcement options available under the statutes. *Ante*, ¶ 23. The majority first

imagines that litigation to secure fines, penalties and injunctions would necessarily accomplish better code compliance than closing dangerous buildings, and then concludes that an enforcement regime limited to inspection and closure of dangerous buildings is subject to mandamus as an "arbitrary abuse of power" because such a program leaves rental housing no "safer or healthier than it would be without any housing code at all." *Ante,* ¶ 26.

¶ 53. This is a fallacy for at least three reasons. First, the inspection and closure of dangerous housing for uncorrected code violations obviously removes unsafe housing from the rental market, which is, at worst, still a better result than having no housing code at all. Second, nothing in the pleadings support an implication that scofflaw landlords would respond more compliantly to a system of monetary penalties and injunctions, or that such sanctions are otherwise inherently more compelling, than the Department's "comply or close" enforcement program described by plaintiffs. Third, and most importantly, it cannot be an abuse of discretion for the Department to exercise the discretion expressly granted by the Legislature to set priorities and elect, from several express options, how to enforce the housing code.

¶ 54. That plaintiffs or this Court might exercise enforcement discretion differently does not mean that the Department's enforcement decisions are an abuse of discretion. Plaintiffs cannot, with a straight face, seek to enjoin the Department's enforcement of the housing code on the one hand, and on the other hand complain that there is no enforcement. "Mandamus will not lie for the review of acts that involve the exercise of judgment or discretion." *Richardson,* 164 Vt. at 424, 671 A.2d at 1247. Plaintiffs' mandamus complaint fails to allege the necessary "abuse of power" amounting to a refusal by the Department, virtual or otherwise, to enforce the housing codes as authorized by the statutes. *Id.* Hence, the trial court properly dismissed the complaint.

¶ 55. Plaintiffs fare no better on their takings claim. As the majority recognizes, plaintiffs have no valid takings claim based on the Department's decision to close their buildings or to terminate their utility services due to an imminent hazard. Plaintiffs complain that the Department's condemnation of a dangerous building amounted to a taking of their leasehold, but the law is settled that governmental abatement of a fire hazard is not a compensable taking. *Eno v. City of Burlington,* 125 Vt. 8, 13, 209 A.2d 499, 504 (1965). Nevertheless, the majority again seeks to resurrect plaintiffs' complaint by recasting its takings claims as a claim for compensation based on the Department allowing a nuisance to persist unabated after ongoing inspections. The

majority reasons that the government can be financially liable for the loss of the leaseholds if, "[b]ut for the Department's failure to act, there would have been no nuisance to abate," and so no need to condemn the residences. *Ante*, ¶¶ 34-35. Under this logic, the police become liable for the acts of the criminals.

¶ 56. The majority's theory first depends on the viability of plaintiffs' inconsistent claim that the Department refused or failed to act by inspecting and condemning the rental units. The underlying mandamus claim is untenable, and the takings claim must fail for the same reason. Plaintiffs' pleadings admit that the Department did take action, although not the action prescribed by plaintiffs, and the majority agrees that the actions taken were authorized by the statutes.

¶ 57. The majority erroneously "ascertain[s] that plaintiffs' complaint corresponds to general takings principles." *Ante*, ¶ 34. General principles of takings law are neatly summarized in Chapter I, Article 2 of the Vermont Constitution: "[W]henever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." Excluding police intervention, compensable takings normally require a governmental interference with private property, "and exclusion of the owner from its beneficial use." See *Griswold v. Town Sch. Dist. of Weathersfield*, 117 Vt. 224, 226, 88 A.2d 829, 831 (1952). The deterioration of a tenant's use and enjoyment of a leasehold imagined by the majority as resulting from the Department's decision not to seek monetary penalties and injunctions does not correspond to general takings principles. Such a decision by the Department interferes with no property interest. There is no public use. Short of a closure order responding to an imminent hazard which the majority agrees is not a taking, tenants are not to be excluded from their leaseholds. Plaintiffs' takings claim is not merely "novel or extreme," as the majority suggests, *ante*, ¶ 34, but is unrecognizable and nonexistent in law.

¶ 58. This really appears to be a damages claim for alleged Department nonfeasance masquerading as a takings claim. The majority recognizes as much when it confirms that plaintiffs "seek compensation for the Department's role in allowing the nuisance to continue unabated for so long." *Ante*, ¶ 33. The legal and practical effect of the majority extending inverse takings claims to allege inaction by government agencies is troubling. All victims of loss arising from regulatory or criminal violations by third parties could claim compensation upon a mere allegation that "but for" a lack of action by the enforce-

ment authority, the offender could not have succeeded.[9] Such a claim could arise whenever a regulatory agency head, prosecuting authority, or police chief charged with the general duty of enforcing the law determined to prioritize enforcement efforts in one area at the necessary expense of another. Even if no liability ultimately obtained, what resources would be diverted to pretrial discovery and litigation of such causes of action? Since total deprivation of a leasehold due to condemnation cannot be a taking, *Eno*, 125 Vt. at 13, 209 A.2d at 504, how can an agency's alleged inaction leading to condemnation, but resulting in less than a taking, be compensable as a taking? The cause of action invented by the majority is unworkable.

¶ 59. I would affirm the trial court's dismissal of the takings claim, as well as the underlying mandamus claim upon which it is based. I am authorized to say that Chief Justice Reiber joins in the dissent.

---

[9] The majority asserts that this mischaracterizes plaintiffs' takings claim, contending that plaintiffs allege a "complete failure of the Department to act as statutorily prescribed — affecting an entire class of persons." *Ante*, ¶ 35 n.6. The majority is incorrect on several levels. The statutes do not prescribe, in the mandatory sense, that the Department do anything plaintiffs insist upon. On the other hand, the Department's enforcement actions as alleged by plaintiffs were explicitly authorized by the statute. While plaintiffs employ the words "wholesale failure," this merely conclusory pleading is plainly contradicted by their factual allegations of enforcement as recited in the complaint and by the majority. These named plaintiffs failed to effectively allege an "entire class" affected by the Department's enforcement actions. Intended or not, given that plaintiffs allege the Department took enforcement action and complain that its enforcement was unsatisfactory, the majority today recognizes a cause of action for compensation for imperfect law enforcement.